Daniel Sadeh, Esq.
**HALPER SADEH LLP**
667 Madison Avenue, 5th Floor
New York, NY 10065
Telephone: (212) 763-0060
Facsimile: (646) 776-2600
Email: sadeh@halpersadeh.com

*Counsel for Plaintiff*

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| STEVEN JONES, | Case No: |
| Plaintiff, | |
| v. | JURY TRIAL DEMANDED |
| LIVONGO HEALTH, INC., GLEN TULLMAN, ZANE BURKE, CHRIS BISCHOFF, KAREN L. DANIEL, SANDRA FENWICK, PHILIP D. GREEN, and HEMANT TANEJA, | |
| Defendants. | |

Plaintiff Steven Jones ("Plaintiff"), by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys.

### <u>NATURE OF THE ACTION</u>

1.      This is an action against Livongo Health, Inc. ("Livongo" or the "Company") and its Board of Directors (the "Board" or the "Individual Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78n(a) and 78t(a), and Rule 14a-9 promulgated thereunder by the SEC, 17 C.F.R. § 240.14a-9, in

connection with the proposed acquisition of Livongo by Teladoc Health, Inc. ("Teladoc") through a wholly-owned subsidiary (the "Proposed Transaction").[1]

2.      On September 15, 2020, Defendants caused to be filed with the SEC a Schedule 14A Definitive Proxy Statement (the "Proxy Statement") pursuant to Section 14(a) of the Exchange Act in connection with the Proposed Transaction.

3.      In connection with the Proposed Transaction, Livongo shareholders will receive 0.592 shares of Teladoc stock and $4.24 in cash for each share of Livongo common stock they own, in addition to a special cash dividend equal to $7.09 per share.

4.      The Proxy Statement, which recommends that Livongo shareholders vote in favor of the Proposed Transaction, omits and/or misrepresents material information concerning: (i) the financial projections of Livongo and Teladoc; (ii) the financial analyses performed by Livongo's financial advisor, Morgan Stanley & Co. LLC ("Morgan Stanley"), in connection with its fairness opinion; (iii) potential conflicts of interest involving Morgan Stanley; and (iv) the background of the Proposed Transaction.

5.      These material misrepresentations and omissions prevent the Company's shareholders from making a fully informed voting decision on the Proposed Transaction. Accordingly, the Company's shareholders will be irreparably harmed if these material misrepresentations and omissions are not remedied before the October 29, 2020 shareholder vote on the Proposed Transaction.

---

[1] The wholly-owned subsidiary is Tempranillo Merger Sub Inc.

## JURISDICTION AND VENUE

6.     The claims asserted herein arise under and pursuant to Sections 14(a) and 20(a) of the Exchange Act (15 U.S.C. §§ 78n(a) and 78t(a)) and Rule 14a-9 promulgated thereunder by the SEC (17 C.F.R. § 240.14a-9).

7.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

8.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)) as a substantial portion of the transactions and wrongs complained of herein had an effect in this District, the alleged misstatements entered and the subsequent damages occurred in this District, and Teladoc's headquarters is located in New York.[2]

9.     In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

10.     Plaintiff is, and has been at all relevant times hereto, an owner of Livongo common stock.

11.     Defendant Livongo provides an integrated suite of solutions for the healthcare industry in North America. The Company is incorporated in Delaware. The Company's common stock trades on the Nasdaq Global Select Market under the ticker symbol, "LVGO."

12.     Defendant Glen Tullman ("Tullman") is the founder of Livongo and Chairman of the Board of the Company.

---

[2] *See* Teladoc, *Contact*, https://teladochealth.com/contact/ (last visited Sept. 17, 2020).

3

13.     Defendant Zane Burke ("Burke") is Chief Executive Officer ("CEO") and a director of the Company.

14.     Defendant Chris Bischoff ("Bischoff") is a director of the Company.

15.     Defendant Karen L. Daniel ("Daniel") is a director of the Company.

16.     Defendant Sandra Fenwick ("Fenwick") is a director of the Company.

17.     Defendant Philip D. Green ("Green") is a director of the Company.

18.     Defendant Hemant Taneja ("Taneja") is a director of the Company.

19.     Defendants Tullman, Burke, Bischoff, Daniel, Fenwick, Green, and Taneja are collectively referred to herein as the "Individual Defendants."

20.     Defendants Livongo and the Individual Defendants are collectively referred to herein as the "Defendants."

## SUBSTANTIVE ALLEGATIONS

### A. Background of the Company and the Proposed Transaction

21.     Livongo's solutions promote health behavior change based on real-time data capture supported by intuitive devices and insights driven by data science. Livongo offers a platform that provides cellular-connected devices, supplies, informed coaching, data science-enabled insights, and facilitates access to medications. Its products include Livongo for diabetes, Livongo for hypertension, Livongo for prediabetes and weight management, and Livongo for behavioral health by myStrength.

22.     On July 29, 2019, Livongo announced the closing of its Initial Public Offering ("IPO") of 14,590,050 shares of common stock at an offering price of $28.00 per share. Livongo received net proceeds of $377.5 million from its IPO.

23.     On May 6, 2020, Livongo issued a press release announcing its first quarter 2020 financial results. Livongo's total revenue for the quarter was $68.8 million, up 115% year-over-year. Defendant Burke commented that the COVID-19 pandemic accelerated the need for virtual care models like Livongo and that Livongo was benefitting from this transition, stating in pertinent part:

> "Livongo is well positioned to provide assistance to some of the most vulnerable populations during the COVID-19 pandemic - people with chronic conditions - and our remote monitoring, digitally powered and real-time personal coaching capabilities, and access to telehealth services are well suited to track vital signs of interest in maintaining the health of our Members," said Zane Burke, Chief Executive Officer of Livongo. "The COVID-19 pandemic has accelerated the need for new virtual care delivery models like Livongo. We are pleased to announce our relationship with the Government Employees Health Association, Inc. (GEHA), to provide the Livongo for Diabetes, Hypertension, and Diabetes Prevention solutions for federal employees, retirees, and their dependents that receive GEHA medical coverage."

24.     The next day, Livongo's stock rose $5.47 per share or over 11.6% to close at $52.43 per share on May 7, 2020.

25.     In the wake of Livongo's positive earnings release, on May 7, 2020 Mobi Health News confirmed that Livongo, a digital health company, was seeing its business grow amid the COVID-19 crisis. The article states, in pertinent part:

### New clients, COVID-19 demand pump up Livongo's Q1 revenue, 2020 projections

"Remote monitoring is here to stay," CEO Zane Burke said during yesterday's earnings call.

By Dave Muoio May 07, 2020 03:09 pm

A number of digital health companies have seen their businesses grow amid the COVID-19 crisis, and so far Livongo Health appears to be no exception. The company announced strong quarterly results headlined by revenue growth and a record number of client launches.

Taking new agreements and the prospect of continued demand for virtual services into account, the company said that it has raised its full-year and second-quarter outlook.

"There is no question in our mind that this pandemic has accelerated a more extensive virtual-care-delivery model," CEO Zane Burke said during yesterday's investor call. "Remote monitoring is here to stay, and we expect it to become the standard of care for the most vulnerable and expensive populations."

The company also used its earnings report to announce a new contract with the Government Employees Health Association (GEHA) that will see Livongo's diabetes, hypertension and diabetes-management products made available to federal government beneficiaries covered by GEHA.

**TOPLINE**

Livongo's total revenue for the first quarter of 2020 came in at $68.8 million, a 115% year-over-year increase that exceeded the company's early-April expectation of $65.5 to $66.5 million in total revenue. GAAP net loss was $5.6 million (–$0.06 per share), compared to a $14.4 million loss (–$0.79 per share) reported last year.

The company brought on 380 new clients in the first quarter to reach 1,252 total clients, a 44% increase over last quarter's 804. The company now reports 328,510 members enrolled in its Livongo for Diabetes program, compared to 164,168 in Q1 2019 and nearly 223,000 in Q4 2019. These increases bring the estimated value of Livongo's agreements to $89 million – just a few million shy of doubling Q1 2019's $48.1 million estimated value of agreements.

**ON THE RECORD**

"We began 2020 well positioned to pursue our mission of empowering people with chronic conditions to live better and healthier lives," Burke said. "Today, Livongo is even more strongly positioned. Increasingly, everyone is realizing that our remote-monitoring solutions and our focus on the most critical, vulnerable populations are necessary to support our members through this pandemic in the near term and longer term as the market continues to shift to a virtual care model."

**LOOKING BACK**

Livongo is nearing the one-year mark of its IPO, and has been steadily working to expand its data-driven "whole person platform" for chronic-condition management and health-behavior change.

And much like the last quarter's report, where the company highlighted new agreements with major names like CVS and Express Scripts, Burke took the time to highlight Livongo's highest profile deals within the last few months. These

included the closure of the major GEHA contract, and Livongo's selection as the first marketplace partner of the Health Transformation Alliance (HTA) and Welltok.

**LOOKING AHEAD**

Total revenue for the second quarter of the year is projected to fall between $73 million and $75 million. Livongo is expecting 70% to 78% revenue growth for the full year, equating to a range of $290 million to $303 million in total annual revenue. This is a bump over the company's prior guidance of $280 million to $290 million.

While the company is primed to meet COVID-19 demand and deliver its digital platform to more clients, CFO Lee Shapiro noted that the epidemic's hardships could affect Livongo indirectly through the company's various affiliates.

"The company continues to closely monitor the situation relating to the COVID-19 pandemic for impacts on our business, as many of our clients and members have experienced economic challenges," Shapiro said in a statement. "Livongo is well positioned to deliver remote care for members at a time when clients appreciate the importance of ensuring the health of their beneficiaries and team members."

26.     Around June 2020, representatives of Teladoc and Livongo met to discuss a potential business combination of the two companies.

27.      On July 7, 2020, Livongo issued a press release announcing its preliminary second quarter 2020 financial results. Livongo raised its revenue guidance for the quarter to the range of $86 million to $87 million, up from prior guidance of $73 million to $75 million.

28.     On this news, Livongo's stock rose $16.13 per share or over 20.7% to close at $93.76 per share on July 7, 2020.

29.     On July 26, 2020, after months of negotiating a merger of Teladoc and Livongo, the two companies were supportive of an exchange ratio which would provide for a fixed 40% pro forma ownership of the combined company by Livongo's shareholders if the implied value per share of Livongo stock fell within a range of $131 per share to $139 per share, provided, however, that if the implied value fell outside of this range the exchange ratio would be adjusted to ensure

the implied value per share would be equal to $131 to $139 per share. Based on the previous day's closing prices, such proposal would value Livongo common stock at $131 per share and Livongo stockholders would collectively own approximately 43% of the combined company.

30.     On Monday, July 27, 2020, Livongo's stock closed at $108.56 per share, down $0.57 per share from the previous closing price of $109.13 per share on Friday, July 24, 2020.

31.     On July 31, 2020, Livongo's financial advisor held discussions with Teladoc's financial advisor to "express concern regarding the exchange ratio framework underlying the Teladoc July 26, 2020 offer" as the proposed price mechanism was not resulting in the value allocation previously articulated in that offer due to Livongo's appreciation in share price relative to Teladoc's stock. As of July 31, 2020, Livongo's stock had closed at $127.25 per share, representing an increase of $18.69 per share or 17.2% from Livongo's closing stock price of $108.56 per share on July 27, 2020.

32.     On August 1, 2020, the Board discussed the impact of Livongo's increasing share price relative to Teladoc's. As a result of this price movement, the price per share implied by the exchange ratio that Teladoc and Livongo tentatively agreed upon in July 2020 was beginning to imply a smaller premium to Livongo's then prevailing stock price. The Board instructed Morgan Stanley to revisit discussions with Teladoc regarding the exchange ratio. The Board believed that Livongo shareholders should receive a reasonable premium.

33.     On August 4, 2020, the Board continued to believe that the increasing price of Livongo's common stock warranted revisiting the prior tentatively agreed upon methodology for determining the exchange ratio for the transaction. On August 4, 2020, Livongo's stock had closed at $144.53 per share, representing an increase of $35.97 per share or 33.1% from Livongo's closing price of $108.56 per share on July 27, 2020.

34.     On or around August 3 and August 4, 2020, Teladoc management determined to revise its July 26, 2020 proposal "in a manner that would result in Livongo's stockholders receiving 41% pro forma ownership of the combined company and $1.3 billion in cash, which combined consideration implied a value per share of Livongo common stock of $151.58 and a 5% premium to the then prevailing trading price of Livongo stock." Defendant Tullman indicated to Teladoc's representative that the Board would not support an exchange ratio that implied less than a 10% premium to Livongo's trading price at announcement.

35.     To salvage a deal, on August 4, 2020, Teladoc responded with a revised proposal to Livongo "pursuant to which Livongo stockholders would receive per share merger consideration of 0.5920 shares of Teladoc common stock and $4.24 in cash and a special cash dividend equal to $7.09 per share (which, at the prevailing Livongo and Teladoc stock price, collectively implied that Livongo stockholders would receive approximately 42% pro forma ownership of the combined company and a value per share of Livongo common stock of $158.98, which represented a 10% premium to the closing price per share of Livongo common stock on August 4, 2020)."

36.     Thereafter, the Board discussed Teladoc's revised proposal and determined it was in the best interest of Livongo's stockholders. The Board "determined to adjourn and reconvene when the legal documentation for the transaction had been finalized and Morgan Stanley could deliver its fairness opinion."

37.     On August 5, 2020, before market hours, Livongo reported its actual second quarter 2020 financial results, which far exceeded its July 7th preliminary forecasts. Livongo reported $91.9 million in total revenue for the quarter, up 125% year-over-year. Defendant Burke touted Livongo's future growth and prospects, stating, in pertinent part:

> "Livongo entered 2020 with significant momentum and our strong results continued during the second quarter," said Zane Burke, Chief Executive Officer of

Livongo. "Innovative employers and health plans are choosing Livongo due to our leading Consumer Directed Virtual Care model and our ability to deliver significant clinical and financial improvements through a one-to-many approach. As we experience the further adoption of virtual health and remote monitoring technologies as the new standard of care, Livongo continues to build on its leadership position."

38.    Indeed, the Company has performed so well that less than one year since Livongo's IPO closed, its stock price had increased over four-fold.

39.    Despite Livongo's strong prospects as a standalone company, on August 5, 2020, before market hours, Teladoc and Livongo issued a press release announcing that they had entered into a definitive merger agreement pursuant to which Livongo shareholders would receive 0.592 shares of Teladoc stock and $11.33 in cash for each Livongo share. Upon completion of the merger, Teladoc shareholders would own approximately 58% of the combined company while Livongo shareholders would own approximately 42%. The press release announcing the Proposed Transaction states, in pertinent part:

### Teladoc Health and Livongo Merge to Create New Standard in Global Healthcare Delivery, Access and Experience

August 05, 2020 06:07 ET | **Source:** Teladoc Health, Inc.

- The only consumer centered virtual care platform for full spectrum of health needs to address accelerating consumer and client demand

- Combination of highly complementary leaders in virtual care and chronic condition management uniquely positioned to unlock the full potential of virtual care

- New high-quality care delivery model creates new category of solutions focused on delivering unrivaled whole-person care for better health outcomes at lower cost

- Significant quantifiable revenue expansion opportunities increase shareholder value as two of the fastest-growing companies in healthcare technology combine

PURCHASE, NY and MOUNTAIN VIEW, Calif., Aug. 05, 2020 (GLOBE NEWSWIRE) -- Teladoc Health (TDOC), the global leader in virtual care, and Livongo (LVGO), the leading Applied Health Signals company – today announced that they have entered into a definitive merger agreement. This merger represents a transformational opportunity to improve the delivery, access and experience of healthcare for consumers around the world. The highly complementary organizations will combine to create substantial value across the healthcare ecosystem, enabling clients everywhere to offer high quality, personalized, technology-enabled longitudinal care that improves outcomes and lowers costs across the full spectrum of health.

Under the terms of the agreement, which has been unanimously approved by the Board of Directors of each company, each share of Livongo will be exchanged for 0.5920x shares of Teladoc Health plus cash consideration of $11.33 for each Livongo share, representing a value of $18.5 billion based on the closing price of Teladoc Health shares as of August 4, 2020. Upon completion of the merger, existing Teladoc Health shareholders will own approximately 58 percent and existing Livongo shareholders will own approximately 42 percent of the combined company.

The combination of Teladoc Health and Livongo creates a global leader in consumer centered virtual care. The company will have expected 2020 pro forma revenue of approximately $1.3 billion, representing year over year pro forma growth of 85 percent. Demonstrating the power of the combined platform and the scalability of the data driven and virtual ethos, the combined company is expected to have pro forma Adjusted EBITDA of over $120 million for 2020.

"This merger firmly establishes Teladoc Health at the forefront of the next-generation of healthcare," said Jason Gorevic, CEO of Teladoc Health. "Livongo is a world-class innovator we deeply admire and has demonstrated success improving the lives of people living with chronic conditions. Together, we will further transform the healthcare experience from preventive care to the most complex cases, bringing 'whole person' health to consumers and greater value to our clients and shareholders as a result."

"This highly strategic combination will create the leader in consumer-centered virtual care and provides a unique opportunity to further accelerate the growth of our data-driven member platform and experience," said Glen Tullman, Livongo Founder and Executive Chairman. "By expanding the reach of Livongo's pioneering Applied Health Signals platform and building on Teladoc Health's end-to-end virtual care platform, we'll empower more people to live better and healthier lives. This transaction recognizes Livongo's significant progress and will enable Livongo shareholders to benefit from long-term upside as the combined company is positioned to serve an even larger addressable market with a truly unmatched offering."

**Strategic and financial benefits of the combination**

- **The combination joins two highly complementary companies to create an unmatched, comprehensive platform for virtual healthcare delivery**. By bringing together leaders in virtual health and chronic condition management, the merger combines comprehensive clinical expertise with a rich technology and data-driven experience; prevention and chronic condition management with acute and specialty care; behavior change expertise with data science; global footprint with products meeting global need; access with innovation and two of the fastest growing companies in health technology.

- **Combining clinical expertise with deeper, more comprehensive consumer health insights to deliver the highest quality care and improve outcomes.** The transaction combines Teladoc Health's broad integrated services across virtual care with Livongo's data-driven approach to providing actionable, personalized, and timely health signals to create a comprehensive virtual healthcare delivery system. The combined company's platform will feature the full range of health support – from AI+AI engine-driven "nudges" and health coaches to therapists and board-certified physicians and the world's leading specialists – available anytime, anywhere to ensure the right care is always delivered.

- **Focusing on prevention as a critical lever for reimagining healthcare delivery.** Together, Teladoc Health and Livongo will empower consumers to proactively manage their wellbeing with the help of a single, comprehensive partner across the full spectrum of health, whether they are at-risk of, or living with, chronic conditions or need acute care. By tapping into data and care anytime, anywhere, consumers will have real-time information and guidance to stay healthy and avoid the unchecked progression of illness.

- **Joining two leaders in consumer behavior change, bringing millions more consumers into virtual care and building even deeper consumer and provider relationships.** Teladoc Health's flywheel approach to continued member engagement combined with Livongo's proven track record of using data science to build consumer trust will accelerate the combined company's development of longitudinal consumer and provider relationships.

- **Expanding Teladoc Health's portfolio and footprint with Livongo's leadership in addressing underpenetrated and underserved chronic condition populations.** Teladoc Health's global reach, including 70 million customers in the United States, and significant access to high growth segments in that market (e.g., Medicare and Medicaid) give Livongo a stronger platform to reach millions of new consumers, at risk of, or living with chronic disease.

- **Complementary cultures and operating philosophies that put a premium on health equity.** Teladoc Health has long focused on virtual care as the "great

equalizer" expanding access to underserved communities facing negative social determinants of health. With Livongo's focus on chronic conditions, which disproportionately impacts underserved communities, the combined company will be positioned to make meaningful progress on addressing long-standing disparities.

- **Significant shareholder value creation and revenue acceleration opportunities.** The combined company is positioned to execute quantified opportunities to drive revenue synergies of $100 million by the end of the second year following the close, reaching $500 million on a run rate basis by 2025. These opportunities include increased cross-selling and penetration into each company's client base. They also include accelerating Livongo's international expansion through Teladoc Health's existing footprint, improving combined company member retention rates and driving more efficient enrollment. In addition to the quantified synergies, the combination offers significant unquantified synergies by enabling new care models and next generation solution opportunities. As a result of efficiencies, the combined company is expected to achieve cost synergies of $60 million by the end of the second year following the close, which can be reinvested to drive topline growth and margin expansion.

**Leadership & Governance**

Jason Gorevic, current CEO of Teladoc Health, will be the CEO of the combined company. Led by Teladoc Health chairman, David Snow, the newly combined Teladoc Health Board of Directors will be composed of eight members of the Teladoc Health Board and five members of the Livongo Board.

**Additional Transaction Details**

The transaction is expected to close by the end of Q4 2020, subject to regulatory and Teladoc Health and Livongo shareholder approvals and other customary closing conditions. The newly combined company will be called Teladoc Health and will be headquartered in Purchase, New York.

**Advisors**

Lazard served as exclusive financial advisor to Teladoc Health and Paul, Weiss, Rifkind, Wharton & Garrison LLP served as legal advisor.

Morgan Stanley served as exclusive financial advisor to Livongo and Skadden, Arps, Slate, Meagher & Flom LLP served as legal advisor.

*        *        *

**About Teladoc Health**

Teladoc Health is transforming how people access and experience healthcare. Recognized as the world leader in virtual care, Teladoc Health directly delivers millions of medical visits across 175 countries each year through the Teladoc Health Medical Group and enables millions of patient and provider touchpoints for thousands of hospitals, health systems and physician practices globally. Ranked #1 among direct-to-consumer telehealth providers in the J.D. Power 2019 U.S. Telehealth Satisfaction Study and Best in KLAS for Virtual Care Platforms for 2020, Teladoc Health leverages more than a decade of expertise and real-time insights to meet the growing virtual care needs of consumers, healthcare professionals, employers and health plans. For more information, please visit **teladochealth.com** or follow **@TeladocHealth** on Twitter.

**About Livongo**

Livongo empowers people with chronic conditions to live better and healthier lives, beginning with diabetes and now including hypertension, weight management, diabetes prevention, and behavioral health. Livongo pioneered the category of Applied Health Signals to offer Members clinically based insights that focus on the whole person and make it easier to stay healthy. Using its AI+AI engine, Livongo's team of data scientists aggregate and interpret substantial amounts of health data and information to create actionable, personalized and timely health signals delivered to Livongo Members exactly when and where they need them. The Livongo approach delivers better clinical and financial outcomes while creating a different and better experience for people with chronic conditions. For more information, visit: **www.livongo.com** or engage with Livongo on **LinkedIn** or **Twitter**.

40.    The market for Livongo's stock did not react favorably to this news. On August 5, 2020, Livongo's stock fell $16.47 per share or over 11.3% to close at $128.06 per share that day.

**B. The Proxy Statement Contains Materially False and Misleading Statements and Omissions**

41.    As detailed herein, the Proxy Statement omits and/or misrepresents material information concerning: (i) the financial projections of Livongo and Teladoc; (ii) the financial analyses performed by Morgan Stanley; (iii) potential conflicts of interest involving Morgan Stanley; and (iv) the background of the Proposed Transaction.

42.    The omission of the material information (referenced below) renders the following sections of the Proxy Statement false and misleading, among others: (i) Background of the Merger;

14

(ii) Recommendation of the Livongo Board of Directors; Livongo's Reasons for the Merger; (iii) Opinion of Livongo's Financial Advisor; and (iv) Livongo Unaudited Financial Projections.

43.     Plaintiff may seek to enjoin the anticipated October 29, 2020 shareholder vote on the Proposed Transaction unless and until the material misstatements and omissions (referenced below) are remedied. Unless remedied, Livongo shareholders will be forced to make a voting decision on the Proposed Transaction without full disclosure of all material information. In the event the Proposed Transaction is consummated, Plaintiff seeks to recover damages resulting from Defendants' misconduct.

## 1.     Material Omissions Concerning Livongo's and Teladoc's Financial Projections

44.     The Proxy Statement omits material information concerning Livongo's and Teladoc's financial projections.

### (a)     Livongo's Financial Projections

45.     According to the Proxy Statement, Livongo's management prepared two sets of financial projections for Livongo for the third and fourth quarters of calendar year 2020 and calendar years 2021 and 2022, which were then extrapolated for calendar years 2023 through 2030. *See* Proxy Statement at 123-24. These projections are referred to in the Proxy Statement as "Plan A projections" and "Plan B projections" (collectively, the "Company's Projections"). *Id.* at 124.

46.     The Plan A projections apparently "reflected an optimistic view of Livongo's projected financial results based on stable growth rates" while the Plan B projections "reflected what Livongo's management and the [Board] believed to be a more realistic view of Livongo's projected financial results based on an expectation that the growth and profitability in the company's industry would attract new market entrants, which would slow growth rates and pressure margins." *Id.*

47.     The Board "***reached a consensus*** that Plan B [projections] represented the appropriate framework for evaluating Livongo's stand-alone valuation in comparison to the merger with Teladoc and, therefore, the [Board] instructed Morgan Stanley to use the Plan B projections for purposes of assessing the fairness of the merger with Teladoc." *Id*. (emphasis added). The Proxy Statement, however, fails to disclose which members of the Board had misgivings concerning the aforementioned and their rationale for having such doubts.

48.     The Proxy Statement fails to: (i) quantify the Board's determination that the Plan B projections were a "more realistic view of Livongo's projected financial results" than the Plan A projections; and (ii) provide a sufficient explanation for the Board's conclusion.

49.     The Proxy Statement fails to disclose the following concerning the Company's Projections: (1) all line items used to calculate (i) Revenue, (ii) Adjusted EBITDA, and (ii) Unlevered Free Cash Flow; and (2) a reconciliation of all non-GAAP to GAAP metrics.

(a)     **Teladoc's Financial Projections**

50.     According to the Proxy Statement, Teladoc's management prepared two sets of financial projections for Teladoc through 2022, referred to in the Proxy Statement as "Case 1" and "Case 2." *See* Proxy Statement at 124. With these projections, Livongo extrapolated Teladoc's financial results for calendar years 2023 through 2030 and unlevered free cash flows for the third and fourth quarters of calendar year 2020 and for calendar years 2021 through 2030. *Id*. The Board reviewed these projections, including Teladoc's unlevered free cash flows and extrapolations of the unlevered free cash flows for 2023 through 2030, and approved their use by Morgan Stanley in connection with its financial analyses. *Id*.

51.     With respect to the Case 1 forecasts, the Proxy Statement fails to disclose: (1) all line items used to calculate (i) Revenue, (ii) Adjusted EBITDA, and (iii) Unlevered Free Cash

Flow; (2) the Case 1 forecasts for the years 2023 through 2030; and (3) a reconciliation of all non-GAAP to GAAP metrics.

52.     The Proxy Statement fails to disclose the Case 2 forecasts and Livongo's extrapolations therefrom, as applicable.

53.     The disclosure of the aforementioned projected financial information is material because it would provide Livongo shareholders with a basis to project Livongo's and the combined company's future financial performance and would allow shareholders to better understand the financial analyses performed by the Company's financial advisor in support of its fairness opinion. Shareholders cannot hope to replicate management's inside view of the future prospects of the Company. Without such information, which is uniquely possessed by Livongo and its financial advisor, the Company's shareholders are also unable to determine how much weight, if any, to place on the Company's financial advisor's fairness opinion in determining whether to vote for or against the Proposed Transaction.

54.     When a company discloses non-GAAP financial metrics in a Proxy Statement that were relied upon by its board of directors in recommending that shareholders exercise their corporate suffrage rights in a particular manner, the company must also disclose, pursuant to SEC Regulation G, all projections and information necessary to make the non-GAAP metrics not misleading, and must provide a reconciliation (by schedule or other clearly understandable method) of the differences between the non-GAAP financial metrics disclosed or released with the most comparable financial metrics calculated and presented in accordance with GAAP. 17 C.F.R.

§ 244.100.[3]

55.     Accordingly, in order to cure the materially misleading nature of the aforementioned financial projections, Defendants must provide a reconciliation table of the aforementioned non-GAAP metrics to their most comparable GAAP metrics. Defendants must also disclose the line item projections that were used to calculate these metrics. Such projections are necessary to make the non-GAAP projections included in the Proxy Statement not misleading.

56.     The above-referenced omitted information, if disclosed, would significantly alter the total mix of information available to Livongo shareholders.

### 2.     Material Omissions Concerning Morgan Stanley's Financial Analyses

57.     In connection with the Proposed Transaction, the Proxy Statement omits material information concerning analyses performed by Morgan Stanley.

58.     The Proxy Statement fails to plainly disclose the projected synergies anticipated from the merger that were prepared by the managements of Livongo and Teladoc and used by Morgan Stanley in its analyses. *See* Proxy Statement at 107.

59.     The Proxy Statement fails to disclose the following concerning Morgan Stanley's "*Livongo Discounted Cash Flow Analysis*": (1) all unlevered free cash flows used and all underlying line items; (2) the Livongo street case estimates used in the analysis; (3) the terminal values for Livongo; (4) the individual inputs and assumptions underlying the (i) discount rates

---

[3] Mary Jo White, *Keynote Address, International Corporate Governance Network Annual Conference: Focusing the Lens of Disclosure to Set the Path Forward on Board Diversity, Non-GAAP, and Sustainability* (June 27, 2016), https://www.sec.gov/news/speech/chair-white-icgn-speech.html (footnotes omitted) (last visited Sept. 17, 2020) ("And last month, the staff issued guidance addressing a number of troublesome practices which can make non-GAAP disclosures misleading: the lack of equal or greater prominence for GAAP measures; exclusion of normal, recurring cash operating expenses; individually tailored non-GAAP revenues; lack of consistency; cherry-picking; and the use of cash per share data. I strongly urge companies to carefully consider this guidance and revisit their approach to non-GAAP disclosures.").

ranging from 8.3% to 10.2% and (ii) the perpetual growth rates of 2.5% to 3.5%; (5) the estimates of net operating loss and tax credit carryforwards; and (6) the net debt of Livongo.[4]

60.     The Proxy Statement fails to disclose the following concerning Morgan Stanley's "*Teladoc Discounted Cash Flow Analysis*": (1) all unlevered free cash flows used and all underlying line items; (2) the Teladoc street case estimates used in the analysis; (3) the terminal values for Teladoc; (4) the individual inputs and assumptions underlying the (i) discount rates ranging from 7.3% to 8.2% and (ii) the perpetual growth rates of 2.5% to 3.5%; (5) the estimates for net operating loss and tax credit carryforwards; and (6) the net debt of Teladoc.[5]

61.     Morgan Stanley's analyses rely heavily on the Livongo and Teladoc "street cases."[6] Morgan Stanley's analyses using street case forecasts generally paint a less optimistic picture of Livongo's and Teladoc's financial and business prospects than Morgan Stanley's analyses of the Plan A projections, Plan B projections, Case 1 forecasts, and Case 2 forecasts. *See* Proxy Statement at 109-117. It is unclear from the "Opinion of Livongo's Financial Advisor" section of the Proxy Statement why Morgan Stanley included the Livongo and Teladoc "street cases" in its analyses at all. There, the Proxy Statement provides no explanation as to how the street case forecasts were calculated or why they warrant analyzation by Morgan Stanley. Notably, the street case forecasts

---

[4] The Proxy Statement provides that "[t]he estimated unlevered free cash flow estimates for calendar years 2023 through 2030 for each of the Livongo street case and the Livongo management projections were based on extrapolations reviewed and approved for Morgan Stanley's use by Livongo management as of August 4, 2020." *See* Proxy Statement at 113.

[5] The Proxy Statement provides that "the estimated unlevered free cash flow for calendar years 2023 through 2030 for the Teladoc street case and each of the Teladoc management projections were extrapolated and approved for Morgan Stanley's use by Livongo management as of August 4, 2020." *See* Proxy Statement at 113.

[6] The Proxy Statement provides that "Morgan Stanley also used and relied upon certain financial projections based on Wall Street research reports as of August 4, 2020, which are referred to as the Livongo and Teladoc street cases." *See* Proxy Statement at 108.

have the effect of making the merger consideration seem more favorable, enticing Livongo shareholders to approve the Proposed Transaction. The street case forecasts must therefore be disclosed, including a numerical and qualitative summary of their underlying assumptions and a description of why such forecasts are relevant.[7] The omission of this information renders the Proxy Statement materially misleading, particularly in light of the fact that: (i) Livongo's stock price fell on August 5, 2020 after the Proposed Transaction was announced; (ii) Livongo shareholders stand to receive a modest 10% premium in connection with the Proposed Transaction, per the Proxy Statement; (iii) the merger consideration had to be increased last minute to account for Livongo's rising stock price from July 27, 2020 to August 4, 2020 (33% rise) before the Proposed Transaction was announced; and (iv) the Board's concern in July and August 2020 that Livongo shareholders receive a "reasonable premium" for their shares so that the market would view the Proposed Transaction favorably.

62.    With respect to Morgan Stanley's "*Precedent Transaction Multiples Analysis*," the Proxy Statement fails to disclose the individual multiples and financial metrics for all of the companies and transactions observed by Morgan Stanley in its analysis.[8]

---

[7] While the "Background of the Merger" section describes a set of Livongo financial projections that were "based on current Wall Street consensus estimates (which did not reflect Livongo's second quarter earnings announcement and the financial guidance management expected to include therein)," it is unclear whether the description of these projections refer to the Livongo and Teladoc "street cases" that are referenced throughout the "Opinion of Livongo's Financial Advisor" section. *See* Proxy Statement at 87, 108. Livongo shareholders should not have to go on a scavenger hunt through all sections of the several hundred-page Proxy Statement and draw inferences to understand the significance and meaning of the Livongo and Teladoc "street cases." This further supports disclosure of the street case projections, their underlying assumptions, and a more specific qualitative explanation of what they are. Defendants' failure to disclose this information renders the Proxy Statement misleading.

[8] By contrast, the Company disclosed the premiums paid in the transactions listed in Morgan Stanley's "*Precedent Transaction Premiums Analysis*."  *See* Proxy Statement at 115.

63. With respect to Morgan Stanley's "*Analyst Price Targets*" analyses, the Proxy Statement fails to disclose: (1) the price targets for Livongo and Teladoc that were observed by Morgan Stanley; and (2) the sources thereof.

64. With respect to Morgan Stanley's "*Livongo Discounted Equity Value Analysis*" and "*Teladoc Discounted Equity Value Analysis*," the Proxy Statement fails to disclose the individual inputs and assumptions underlying the discount rates of 9.4% and 7.5%.

65. The valuation methods, underlying assumptions, and key inputs used by Morgan Stanley in rendering its purported fairness opinion must be fairly disclosed to Livongo shareholders. The description of Morgan Stanley's fairness opinion and analyses, however, fails to include key inputs and assumptions underlying those analyses. Without the information described above, Livongo shareholders are unable to fully understand Morgan Stanley's fairness opinion and analyses, and are thus unable to determine how much weight, if any, to place on them in determining whether to vote for or against the Proposed Transaction. This omitted information, if disclosed, would significantly alter the total mix of information available to Livongo shareholders.

### 3. Material Omissions Concerning Potential Conflicts of Interest Involving Morgan Stanley

66. The Proxy Statement omits material information concerning potential conflicts of interest involving Morgan Stanley.

67. The Proxy Statement provides that Morgan Stanley and its affiliates have provided "financing services to Livongo, and have received aggregate fees of approximately $10 million to $20 million in connection with such services." *See* Proxy Statement at 120. But the Proxy Statement fails to disclose: (i) the timing and nature of all services Morgan Stanley and its affiliates have provided to the Company and its affiliates, including, but not limited to, advisory and

investment banking services; and (ii) the compensation received for such services.

68.     Morgan Stanley was "a lead underwriter of the company's initial public offering [in July 2019], secondary offering [in December 2019], and convertible debt offering [in 2020]," Proxy Statement at 80, yet the Proxy Statement does not plainly provide the amount of fees Morgan Stanley received in connection with each of these services.

69.     The Proxy Statement fails to disclose whether and to what extent Morgan Stanley provided services to Teladoc and its affiliates, as well as the compensation Morgan Stanley received.

70.     The Proxy Statement discloses that Livongo agreed to pay Morgan Stanley approximately $106 million in fees in connection with the Proposed Transaction, $21 million of which was payable and the remaining portion of which is due upon consummation of the merger. *See* Proxy Statement at 119. Further, Livongo may "pay Morgan Stanley an additional discretionary fee of up to approximately $11 million contingent upon, and subject to, the consummation of the merger." *Id.*

71.     The Proxy Statement, however, fails to disclose the circumstances under which Livongo would pay the $11 million fee to Morgan Stanley.

72.     Disclosure of a financial advisor's compensation and potential conflicts of interest to shareholders is required due to their central role in the evaluation, exploration, selection, and implementation of strategic alternatives and the rendering of any fairness opinions. Disclosure of a financial advisor's potential conflicts of interest may inform shareholders on how much weight to place on that analysis.

73.     The above-referenced omitted information, if disclosed, would significantly alter the total mix of information available to Livongo shareholders.

#### 4.   Material Omissions Concerning the Background of the Proposed Transaction

74.   The Proxy Statement omits material information concerning the background and circumstances leading up to the Proposed Transaction.

75.   The cash component of the $11.33 for each Livongo share consists of a special cash dividend of $7.09 per share to be paid by Livongo and $4.24 per share to be paid by Teladoc.

76.   The Proxy Statement fails to sufficiently disclose how Teladoc is funding its payment of the cash consideration, including whether Teladoc obtained debt financing and whether any financial advisor involved in the Proposed Transaction is a participant or has a role in providing such debt financing.

77.   The Proxy Statement provides that "Livongo may fund a portion of the special dividend through a loan or the sale of certain marketable securities or other assets held by Livongo at fair market value prior to the closing of the merger." *See* Proxy Statement at 79. The Proxy Statement, however, fails to disclose the sources and terms of any potential loans, including whether any financial advisor involved in the Proposed Transaction will be providing the loan.

78.   The above-referenced omitted information, if disclosed, would significantly alter the total mix of information available to Livongo shareholders.

### COUNT I
### For Violations of Section 14(a) and Rule 14a-9 Promulgated Thereunder
### Against All Defendants

79.   Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

80.   During the relevant period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false and misleading Proxy Statement specified above, which failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, in violation of Section 14(a) of

the Exchange Act and Rule 14a-9 promulgated thereunder by the SEC.

81.     Each of the Individual Defendants, by virtue of his/her positions within the Company as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a) of the Exchange Act. Defendants, by use of the mails and means and instrumentalities of interstate commerce, solicited and/or permitted the use of their names to file and disseminate the Proxy Statement with respect to the Proposed Transaction. The Defendants were, at minimum, negligent in filing the materially false and misleading Proxy Statement.

82.     The false and misleading statements and omissions in the Proxy Statement are material in that a reasonable shareholder would consider them important in deciding how to vote on the Proposed Transaction.

83.     By reason of the foregoing, Defendants have violated Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder.

84.     Because of the false and misleading statements and omissions in the Proxy Statement, Plaintiff is threatened with irreparable harm.

**COUNT II**
**Violations of Section 20(a) of the Exchange Act**
**Against the Individual Defendants**

85.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

86.     The Individual Defendants acted as control persons of the Company within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their senior positions as officers and/or directors of the Company and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Proxy Statement filed with the SEC, they had the power to and did influence and control, directly or

indirectly, the decision-making of the Company, including the content and dissemination of the false and misleading Proxy Statement.

87.     Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy Statement and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Proxy Statement, and to correct promptly any public statements issued by the Company which were or had become materially false or misleading.

88.     In particular, each of the Individual Defendants had direct and supervisory involvement in the operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same. The Individual Defendants were provided with or had unlimited access to copies of the Proxy Statement and had the ability to prevent the issuance of the statements or to cause the statements to be corrected. The Proxy Statement at issue contains the unanimous recommendation of the Individual Defendants to approve the Proposed Transaction. Thus, those Individual Defendants were directly involved in the making of the Proxy Statement.

89.     In addition, as the Proxy Statement sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Proposed Transaction. The Proxy Statement purports to describe the various issues and information that they reviewed and considered—descriptions which had input from the Individual Defendants.

90.     By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

91.     As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 promulgated thereunder, by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' conduct, the Company's shareholders will be irreparably harmed.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A.      Preliminarily and permanently enjoining Defendants and all persons acting in concert with them from proceeding with, consummating, or closing the Proposed Transaction and any vote on the Proposed Transaction, unless and until Defendants disclose and disseminate the material information identified above to the Company's shareholders;

B.      In the event Defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding rescissory damages;

C.      Declaring that Defendants violated Sections 14(a) and 20(a) of the Exchange Act, and Rule 14a-9 promulgated thereunder;

D.      Awarding Plaintiff reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

E.      Granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: September 17, 2020

Respectfully submitted,

**HALPER SADEH LLP**

By: /s/ Daniel Sadeh
Daniel Sadeh, Esq.
Zachary Halper, Esq. (to be admitted *pro hac
vice*)
667 Madison Avenue, 5th Floor
New York, NY 10065
Telephone: (212) 763-0060
Facsimile: (646) 776-2600
Email: sadeh@halpersadeh.com
        zhalper@halpersadeh.com

*Counsel for Plaintiff*